GRAND LAKE ESTATES HOMEOWNERS ASSOCIATION, a Colorado Nonprofit Corporation Plaintiff,

v.

Ann VENEMAN, Secretary of the United States Department of Agriculture; Dale Bosworth, Chief of the United States Forest Service; Rick Cables, Regional Forester, United States Forest Service; and James S. Bedwell, Forest Supervisor of the Arapohoe National Forest, Defendants.

No. CIV.A.01–F–1035(OES).

United States District Court,
D. Colorado.

Oct. 22, 2004.

Anthony J. Dicola, Atty at Law, Hot Sulphur Springs, CO, for Plaintiff.

Roxane J. Perruso, Peter J. Krumholz, Denver, CO, for Defendants.

---

1. The Administrative record in this case (AR) consists of one volume, pages 1–413, filed by

## ORDER ON PENDING MOTION

FIGA, District Judge.

This matter comes before the Court on "Defendants' Brief in Support of Administrative Action" filed July 1, 2002 (Dkt.# 29), referred to herein as defendants' motion, and plaintiff's reply brief filed August 5, 2002. In the pretrial order entered on June 6, 2002, the parties stated that both anticipated filing motions for summary judgment. Although papers so captioned were not filed, this Court will treat the filings as cross-motions for summary judgment.

This case was transferred to the undersigned judge pursuant to the general plan for reassignment of cases entered October 28, 2003.

### Procedural background

Plaintiff, Grand Lake Estates Homeowners Association ("GLEHA") filed its complaint in this action on June 7, 2001, and its amended complaint on March 7, 2002. The defendants in this action are the then Secretary of Agriculture and representatives of the United States Forest Service, an agency organized under the Department of Agriculture. The amended complaint asserts four claims for relief seeking a declaratory judgment, injunctive relief, and a writ of mandamus against defendants, as well as a decree to quiet title. The facts that give rise to plaintiff's complaint are as follows.

### Facts based on administrative record

GLEHA owns a marina and docks which was apparently built in the early 1960s, located on a small body of water that exists within the Grand Lakes Estates subdivision (AR [1] 38–39). Pursuant to a "license" issued by the government on or about May 7, 1963, a small man-made

the defendants with their brief on July 1, 2002.

channel, or creek, was also excavated or dredged at approximately the same time to provide navigable access for boats from the subdivision to the Shadow Mountain Reservoir. The Shadow Mountain Reservoir lies entirely on United States property in the Arapahoe National Recreation Area ("ANRA")[2] and is managed by the United States Forest Service (AR 38–39; 40–42). The length of the channel between the marina and Shadow Mountain Reservoir is approximately 100 feet (AR 38).

Despite the fact that the 1963 "license" expressly provided for the licensee to apply for a special use permit governing the operation and maintenance of the boat channel (AR 42), in 1979 GLEHA's treasurer apparently inquired of the Forest Service whether a special use permit was required for the docks at the marina. The District Ranger responded in a letter dated June 15, 1979 that because the boat docks are on private land, no special use permit was required (AR 53).

After creation of the ANRA, the Forest Service began development of interim and final management plans for the area. One of the objectives of these plans was to develop an "indepth analysis of existing water activities" including "guidelines for future shoreline and water surface management." (AR 68.) By memorandum dated November 17, 1980, the regional forester presented a question to the general counsel of the Department of Agriculture, asking whether the public interest permitted the application of special use permits to mooring and boat dock facilities, beyond the area boundaries, when the facilities are constructed to provide direct use of the reservoir surface (AR 83, 87). In an opinion dated February 17, 1981, counsel advised that in carrying out the purposes of the ANRA legislation, the Secretary could regulate any expansion or use of the water surface (AR 87–88).

Although it is not clear from the record whether any specific action was taken based on counsel's opinion, the record does reveal that the ANRA adopted an Area Specific Implementation Plan in 1985 that provided for the Forest Service to determine a special use permit format for association docks.[3] (AR 122). It appears that by letter dated December 18, 1987, the Forest Service first notified GLEHA that it would be requiring a special use permit for GLEHA's marina (AR 162). Although the dates are not clear to this Court, the record shows that sometime thereafter GLEHA applied for, and ANRA issued a special use permit for GLEHA's marina (AR 321–37) and a special use permit for GLEHA's boat docks (AR 338–44). The record indicates that GLEHA was assessed a fee for the 1991 permit in the amount of $1,671 (AR 349), and an annual fee thereafter in the amount of $1,581 (AR 350–53). The record indicates that GLEHA timely paid the fees for 1991 and 1992 (AR 349–50). GLEHA apparently resisted paying the fees for 1993 and 1994, but eventually paid the fees in March 1995, after a meeting was held between GLEHA and the Forest Service regarding renewal of the permit (Defendant's motion, p. 4; AR 351–52). GLEHA also eventually paid the fees for 1995 as well, but indicated on its check that the fee was paid "under protest." (AR 353–54).

---

2. Prior to 1978, the area was known as the Shadow Mountain Recreation Area and was managed by the National Park Service. The ANRA was created in 1978 pursuant to an Act of Congress, Pub L. No. 95–450, now codified as amended at 16 U.S.C. § 460jj *et seq.*

3. This plan was thereafter revised, and the overall management plan adopted for the ARNA in 1991 appears in the administrative record at AR 164–234. The provisions relating to special use permits for association docks can be found at AR 191–92.

Thereafter, between 1996 and 2000, GLEHA refused to pay the fees for the special use permits (*See* AR 355–59, 363–366). By September 6, 2000, the unpaid and back due fees totaled $26,967.75 (AR 367). By letter of the same date, the Forest Service gave notice to GLEHA, and apparently to each of its members, of possible actions the Forest Service might take to enforce the permit requirement, including denial of water access to the main body of Shadow Mountain Reservoir, impoundment of personal property, and impoundment of the member's personal boats (AR 367–70). Apparently, GLEHA made no response to the Forest Service notice.

On November 14, 2000, a formal notice of intent to impound was served on GLEHA (AR 372) and a letter explaining the impoundment and its consequences was sent to each member of GLEHA (AR 374). The notice to GLEHA states that personal property consisting of "approximately 75 freestanding metal and wooden boat docks" would be impounded and might be sold if not redeemed (AR 372). The notice to the individual members states the docks would be "impounded in place" by the closure of the waterway (AR 374). As authority for this impoundment action, the Forest Service cited to 36 C.F.R. § 262.12. *Id.*

On or about December 1, 2000, the Forest Service physically closed access to the Shadow Mountain Recreation Area at the mouth of the channel from the GLEHA docking area, as it had advised it would do (AR 374). The Forest Service apparently accomplished this closure by erecting a fence across the channel, as depicted in a photograph contained in the record (AR 402). There is no indication in the record that the members' boats, or the boat docks, or the marina itself, were subject to any kind of physical seizure, alteration or removal by the government.

Whatever the Forest Service did, it got the attention of GLEHA and it officers. It appears that counsel was retained by GLEHA and a meeting was held on or about December 4, 2000. At the meeting, and in a follow-up letter dated December 13, 2000 from Forest Supervisor Bedwell to counsel for GLEHA, the Forest Service explained the basis for its authority to require the special use permits, and the reasons why it had concluded that such permits were a reasonable exercise of that authority (AR 375–77).

By April 2001, an arrangement was reached whereby GLEHA agreed to sign the special use permit for 2001 under protest and to immediately pay the fees that were due for 2001 in the amount of $6,888.96. The Forest Service agreed to cease impoundment procedures on the docks and remove the waterway closure (AR 383). This agreement was later documented in a stipulation filed in this case on January 25, 2002. The Forest Service would continue to pursue collection of the past due fees, plus amounts it claimed to be due for interest, penalties and administrative costs associated with the closure (AR 383, 396). GLEHA retained the right to pursue through this lawsuit its assertion that the actions of the Forest Service were unlawful (See Defendant's motion, p. 5).

The original complaint in this case was filed by GLEHA on June 7, 2001 seeking only injunctive and declaratory relief. The amended complaint was filed on March 7, 2002, and as described above contains four claims for relief. It is not clear from the administrative record whether the Forest Service ever collected the back fees, interest and penalties it claimed. The Forest Service does state in its brief that GLEHA did not pay the fees for 2002, but that the Forest Service has not taken action as a result of that non-payment pending the

outcome of this case (Defendant's motion, p. 5, n. 2).

### Standard of review

Defendants' motion describes this case as an action brought under the Administrative Procedure Act, 5 U.S.C. § 702, and the Quiet Title Act, 28 U.S.C. § 2409a. The defendants thus argue that dismissal is warranted because the determination of the Forest Service requiring GLEHA to obtain a special use permit was not arbitrary and capricious. (See Defendant's motion, p. 10). Defendants also argue that they are not asserting any real property interest in GLEHA's land, and therefore there is no basis for a quiet title action.

The amended complaint cites to the above statutes and also seeks injunctive and declaratory relief under 28 U.S. §§ 2201 and 2202, as well as a writ of mandamus under 28 U.S.C. § 1361. Thus the case presents not only the questions as to whether the Forest Service acted arbitrarily and capriciously, but also whether it had the lawful authority to require special use permits under these facts, and if so, whether its decision to require the permits here reasonably related to the exercise of that lawful authority. Furthermore, since the defendants either impounded, or at least threatened to impound, property of plaintiff, there is a question whether the Forest Service had such authority under the regulation it relied upon.

### Analysis

*Does the United States Forest Service have the power to require or issue special use permits for GLEHA's marina and boat docks ?*

The statute creating the ANRA specifically directed the Secretary of Agriculture to administer the ANRA in accordance with the law and regulations applicable to the national forests, in a manner that will best provide for among other things "public recreation and enjoyment," the "conser-vation and development of the scenic, natural historic and pastoral values of the area," and "the management of water quality in the recreation area consistent with the development of needed water supply and waste-water systems." 16 U.S.C. § 460jj(b). In furtherance of these objectives, the Secretary was directed by Congress to develop an overall management plan for the ANRA. 16 U.S.C. § 460jj(c). National Forest System is elsewhere defined in the federal statutes as including "all national forest lands reserved or withdrawn from the public domain of the United States, ... and other lands, waters or interests therein which are administered by the Forest Service or are designated for administration through the Forest Service as part of the system." 16 U.S.C. § 1609(a).

Use of National Forest System land is designated a "special use" which the Forest Service can regulate. 36 C.F.R. § 251.50(a). Maintaining any kind of structure or improvement on National Forest System lands without a special use permit is prohibited. 36 C.F.R. § 261.10(a). Special use authorizations must mandate compliance with applicable air and water quality standards and take into account the interests of individuals living in the general area of the use of fish, wildlife, and other biotic resources, and require sitting to cause the least damage to the environment. 36 C.F.R. 251.56(a)(1)(i)(C), (ii)(E), (F). Thus, there is direct authority for the Forest Service to require and issue special use permits on docks and marinas within the boundaries of a national forest. The issue here, however, concerns the power of the Forest Service to require or issue special use permits which affect the use of adjacent private land.

■ The Property Clause of the U.S. Constitution grants broad power to Con-

gress to "make all needful Rules and Regulations respecting the Territory and other Property belonging to the United States." U.S. CONST., art. IV, § 3, cl. 2. As stated in *United States v. Lindsey*, 595 F.2d 5 (9th Cir.1979), it is well-established law that this clause grants power to the United States to regulate conduct on non-federal land when reasonably necessary to protect adjacent federal property or navigable waters. 595 F.2d at 6. The Congress delegated this authority to the Forest Service to administer ANRA land when it created the ANRA. 16 U.S.C. § 460jj *et seq.*

Case law interpreting the Property Clause allows federal regulation on non-federal lands when there is some nexus between the regulation and the protection of the federal property. Long ago the Supreme Court held that "Congress may prohibit the doing of acts upon privately owned lands that imperil the publicly owned forests." *United States v. Alford*, 274 U.S. 264, 267, 47 S.Ct. 597, 71 L.Ed. 1040 (1927). More recently, the Supreme Court held that under the Property Clause, the Federal government's power is "broad enough to reach beyond territorial limits of its property." *Kleppe v. New Mexico*, 426 U.S. 529, 538, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976). In *Minnesota v. Block*, 660 F.2d 1240, 1249 (8th Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1645, 71 L.Ed.2d 876 (1982), the court described Congress' power under the Property Clause as extending "to regulation of conduct on or off the public land that would threaten the designated purpose of federal lands." 660 F.2d at 1249. *See also, United States v. Richard*, 636 F.2d 236, 240 (8th Cir.1980), *cert. denied*, 450 U.S. 1033, 101 S.Ct. 1745, 68 L.Ed.2d 228 (1981) stat-

ing that "federal regulation may exceed federal boundaries when necessary for the protection of .... government forest land or objectives.".

■. The federal government's power to regulate on non-federal lands under the Property Clause is not unlimited. The broad power to regulate on non-federal lands must be "reasonably necessary to protect adjacent federal property or navigable waters." *United States v. Lindsey*, 595 F.2d 5, 6 (9th Cir.1979). Or, put in a slightly different way, the regulation must be necessary for the protection of government forest land or objectives relating to the lands. *United States v. Richard*, supra, 636 F.2d at 240. Under these principles, cases factually similar to this one have allowed federal regulation to extend beyond federal borders. *See, e.g. Free Enterprise Canoe Renters Ass'n of Missouri v. Watt*, 711 F.2d 852, 854–56 (8th Cir.1983) (holding that the National Park Service could issue permit fees to canoe renters for the purpose of reducing canoe traffic even though they operated outside of the National Park,); *United States v. Hells Canyon Guide Service, Inc.*, 660 F.2d 735, 737–38 (9th Cir.1981) (ruling that the Forest Service could regulate Appellant's boat service on waters in the vicinity, and connected to, Hells Canyon National Recreation Area).[4]

Accordingly, while the Forest Service may have the statutory and regulatory authority to require special use permits even as to non-federal lands such as those of plaintiff, the question in this case is whether ANRA's special use permits on GLEHA's private marina were reasonably

---

**4.** GLEHA attempts to distinguish these cases by claiming that the cases are unlike the permit at issue, which GLEHA claims deals only with the parking of the boats. The special use permit is not a fee for parking of boats, but rather, as discussed below, a way to ensure compliance with Federal regulations to preserve the environment and water quality of ANRA.

necessary to protecting ANRA's land and water.

*Are the special use permits required here reasonably related to protecting the lands and waters of the ANRA?*

■ As set forth above, when Congress created the ANRA, it directed the Forest Service to administer the ANRA in a manner intended to create an area to best provide for public recreation and enjoyment, the conservation and development of the scenic, natural, historic, and pastoral values of the area, and the management of water quality in the recreation area. 16 U.S.C. § 460jj(b). Throughout the administrative record, there is evidence that the Forest Service was concerned about these purposes in requiring and issuing special use permits for boat docks and marinas. The Forest Service, for instance, wrote an Area–Specific Implementation Program in 1985 (AR 109–113). The Forest Service Implementation Program summarized the direction of the Service's management plan consistent with the purposes mentioned above (AR 117). The Forest Service hired a hydrologist to summarize the water quality of ANRA's water (AR 145–160). The water quality summary focused on Shadow Mountain Reservoir (AR 152). Concern over water quality is no surprise, as one quarter of ANRA is lake surface (AR 180).

In 1991, the Forest Service published its "Overall Management Plan" (AR 164 *et seq.*). In the Overall Management Plan, the Forest Service expressed concern over scenic and water resources in the Shadow Mountain Reservoir (AR 182–83). The Overall Management Plan also addressed concerns of fish and wildlife management, vegetation management, and fire prevention, all of which affect Shadow Mountain Reservoir and the immediately surrounding area (AR 212–218). The Forest Service determined in that plan to require special use permits for docks such as those owned by GLEHA (AR 191–92). There-

fore, there is ample evidence in the administrative record that the Forest Service was rightly concerned about water resources and general environmental issues relating to the ANRA generally, and Shadow Mountain Reservoir, in particular.

There is also evidence that the special use permits which the Forest Service did eventually issue to GLEHA were directed towards the concerns outlined above, and were thus reasonably necessary to protect Shadow Mountain Reservoir. The terms of the permits, for instance, forbid water pollution in order to preserve the fish, wildlife, and human water supplies (AR 332, 343). By signing the permits, GLEHA also authorized the Forest Service to regulate boat sewage, refuse disposal, erosion, and fire prevention (AR 332–335). The terms of the more recent permit explicitly requires compliance with other Federal statutes, such as the Federal Water Pollution Control Act, the Resource Conservation and recovery Act, and CERCLA, as well as any other environmental laws. (AR 386). The Forest Service is mandated to require such terms and regulations under 36 C.F.R. § 251.56. Because GLEHA's pond is connected to Shadow Mountain Reservoir by a short channel of perhaps only 100 feet in length, the special use permit is reasonably necessary to protect ANRA's land and water. The short distance between the border of ANRA and GLEHA suggests that GLEHA's activities, if unregulated, could have an adverse affect on ANRA's environment. Because Shadow Mountain Reservoir and GLEHA's pond is connected, GLEHA's marina and dock directly affect the water quality of Shadow Mountain Reservoir. The environmental nexus between GLEHA's property and ANRA is not specious or indirect. Thus, this Court concludes that the special use permits required by the Forest Service on docks and marinas on GLEHA's land is reasonably necessary

to protect ANRA, and specifically the environment and water quality of Shadow Mountain Reservoir.[5] There is substantial evidence in the administrative record to support the decision of the Forest Service to require special use permits for the GLEHA docks and marina and no reason to find that such determination was arbitrary or capricious.

*Does the Forest Service have authority to "impound" plaintiff's marina, boat docks and the members' boats?*

While the Forest Service may have authority to require and issue special use permits for the docks and marina located on the property of GLEHA, it does not necessarily follow that the Forest Service has the authority to enforce its issuance of special use permits by "impounding" personal property located on private property that is subject to permitting. From the Court's review of the plaintiff's complaint and amended complaint, it appears that the act of "impounding" is what plaintiff seeks to prevent by means of its request for a mandamus or an injunction.

 As a basis for its exercise of the impoundment order the Forest Service cites to 36 C.F.R. § 262.12, a regulation providing for the impoundment of personal property. This Court, however, does not read this regulation as broadly as the Forest Service, and disagrees with defendants that it provides the authority to impound the boat docks, marina or private boats of plaintiff or its members.

The regulation, by its terms, provides for the impoundment of vehicles, or other inanimate personal property "on National Forest System lands, without the authorization of a Forest officer" and which are "not removed" from the forest land within a prescribed time. In this case, the boat docks, marinas and boats of the members were admittedly not on "National Forest System lands" but rather on private land. To be sure, as an adjunct of regulating National Forest lands, this Court has held that the Forest Service could require permits. But allowing regulation beyond the forest boundary does not conceptually convert private land into National Forest System land for purposes of 36 C.F.R. § 262.12. Accordingly, the regulation cited by defendants does not provide authority, by its own terms, to the Forest Service to physically impound and sell, as it threatened to do, personal property located outside the boundaries of the forest.

Certainly, the Forest Service may use various means to enforce its permitting authority against one who refuses to comply. Here, the Forest Service devised a reasonable method to enforce its permit requirement by erecting the fence across the channel and preventing access by water to Shadow Mountain Reservoir. This Court finds such action to be reasonable and within the ancillary authority the Forest Service may exercise to protect its jurisdiction. However, the physical impounding of docks, marinas and boats on private property is beyond its authority.

**Relief**

Based on the present state of facts, the Court understands that no private property of the plaintiff or its members is under impoundment. Accordingly, the writ of mandamus and injunction requested by plaintiff is not equitably necessary to protect any of plaintiff's rights, and those claims of plaintiff are dismissed as MOOT.

---

5. GLEHA argues that it is unfair for the Forest Service to regulate GLEHA's pond, located outside of ANRA, but not Grand Lake, also located outside of ANRA. This argument while interesting is irrelevant. The only issue for the Court to decide here is whether the Forest Service's regulation of GLEHA's dock and marina is reasonably necessary for the protection of ANRA.

Plaintiff's request for declaratory judgment is DENIED insofar as it requests this Court to declare that the defendants do not have the authority to require special use permits with respect to plaintiff's marina and boat docks, or to declare that defendants may not close off access across the channel connecting plaintiff's marina to the Shadow Mountain Reservoir. It is GRANTED to the extent that it requests the Court to declare that the defendants do not have authority under 36 C.F.R. § 262.12 to physically impound plaintiff's marina and boat docks, or the boats of plaintiff's members.

Plaintiff's request for a decree of quiet title is DISMISSED, as defendants are claiming no interest in the real property of plaintiff.

Judgment shall be entered accordingly, with each party to bear its own costs of suit.